

U.S. Department of Justice

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

July 20, 2021

**BY ECF**
The Honorable Analisa Torres
United States District Court
Southern District of New York
500 Pearl Street
New York, New York 10007

   Re: *United States v. Kevin Liu*,
     S3 15 Cr. 616 (AT)

Dear Judge Torres:

  The Government respectfully submits this letter in advance of the sentencing of defendant Kevin Liu on July 27, 2021. As set forth in the Presentence Investigation Report ("PSR"), the Guidelines range is 97 to 121 months' imprisonment. (PSR at 29). The Probation Office recommends a sentence of 48 months' imprisonment, while the defendant requests a sentence of 31 months' imprisonment, effectively time served. (PSR at 29, 31; Def. Sub. at 2). For the reasons set forth below, the Government respectfully submits that a sentence below the Guidelines range of 97 to 121 months' imprisonment would be fair and appropriate.

**A. Background**

  **1. The Offense Conduct**

  From 2011 through 2013, the defendant and others engaged in a massive scheme to defraud ordinary consumers by placing unauthorized charges for premium text messaging services on their cell phone bills through a practice known as auto-subscribing. (PSR ¶¶ 29-30). To carry out the auto-subscribing scheme, Liu and his co-conspirators caused unsolicited text messages to be sent to mobile phone users offering subscriptions to receive recurring text messages containing content such as horoscopes, celebrity gossip, or trivia facts. (PSR ¶ 30). The mobile phone users who received the unsolicited text messages typically ignored or deleted the messages, often believing them to be spam. (PSR ¶ 30). The victims of the fraud scheme never affirmed their interest in these services at any point. (PSR ¶ 30). Nevertheless, these consumers were billed or "auto-subscribed" for these services, which were known in the industry as premium text messaging ("Premium SMS") services, at a rate of $9.99 per month. (PSR ¶ 30). The $9.99 charge recurred each month unless and until consumers noticed the charges and took action to unsubscribe. Even then, consumers' attempts to dispute the charges and obtain refunds were often unsuccessful. (PSR ¶ 30).

At the time, it was standard industry practice in the Premium SMS industry to require that consumers take two steps to confirm a purchase of a Premium SMS service. This practice was known as "double opt-in" verification. (PSR ¶ 34). For example, a content provider typically advertised to consumers over the Internet. (PSR ¶ 34). The consumer, in response to the Internet advertisement, then entered his or her phone number on the website (the first opt-in), and then received a text message describing how to sign up for the subscription service. (PSR ¶ 34). Typically, the consumer then had to return to the website and enter a PIN number, which was contained in the text message the consumer received, onto the website (the second opt-in). (PSR ¶ 34). Once the consumer had opted-in through the double opt-in process, the consumer was enrolled in the content provider's Premium SMS service, and the charges would begin to appear on the consumer's mobile phone bill. (PSR ¶ 34). In the course of the auto-subscribing scheme carried out by Liu and others, and as confirmed by consumer victims who have been interviewed in connection with this case, consumers never affirmed their interest in the Premium SMS services at any point, let alone through double opt-in verification. (PSR ¶ 35).

During the auto-subscribing scheme, the defendant worked as a Java development engineer for a Sydney, Australia-based digital content provider and mobile aggregator[1] called Bullroarer, which was owned by his co-defendant, Michael Pearse. (PSR ¶ 41). One of Bullroarer's most important accounts was the content provider Tatto Media, which cooperating defendant Lin Miao owned and operated. (PSR ¶¶ 41, 44). Tatto was a U.S.-based digital content provider that offered Premium SMS services to mobile phone customers. In or about 2011, Miao decided to begin auto-subscribing mobile phone users to the Premium SMS services of Tatto, in order to boost Tatto's sagging revenues. (PSR ¶¶ 41, 44).

To do this, Miao needed a way to make it appear that the consumers who were auto-subscribed had actually agreed to be billed for the Premium SMS service, in the event that a mobile carrier or one of the industry compliance groups conducted an audit of customer subscriptions. Put another way, Miao needed to "spoof" or falsify the digital footprints that would convince mobile service companies and industry watch dogs that consumers had, in fact, completed the double opt-in process and consented to the charges on their cellphone bills. Miao approached Michael Pearse for help. Miao asked Pearse to build a computer program that could spoof the required consumer authorizations – i.e., a program that could generate the text message correspondence that one would ordinarily see with genuine double opt-in verifications. Pearse, in turn, tasked Liu with building the platform that would spoof the double opt-in for each mobile number that was run through the platform (the "Auto-Subscription Platform"), which was operational by in or about the middle of 2011. (PSR ¶ 44).

Pearse tasked Liu with creating the Auto-Subscription Platform as part of Liu's otherwise legitimate work as a Java engineer at Bullroarer. Liu earned approximately $35,000 from his position at Bullroarer, in addition to periodic bonuses, neither of which was specifically tied to his

---

[1] Companies known as "mobile aggregators" serve as the middlemen between content providers and the mobile phone carriers. Once a content provider "subscribed" a consumer for Premium SMS services, the charges for the subscription are placed on the consumer's bill by the mobile aggregator. Digital content providers did not have the power to directly place charges on a consumer's cellphone bill. (PSR ¶ 32).

participation in the scheme. (PSR ¶ 38). Even though building out the Auto-Subscription Platform was part of his job, Liu knew that it was wrong. (PSR ¶ 92).

Throughout the summer of 2011, as reflected in, among other things, internal emails retrieved from a computer server used by Tatto (the "Tatto Server"), Miao, Pearse and Liu ran hundreds of thousands of phone numbers, which had been provided to them by other co-conspirators, through the Auto-Subscription Platform. They then billed the subscriptions through mobile aggregators, including a mobile aggregator based in the United States, known as Mobile Messenger. (PSR ¶ 46).

In an effort to protect the revenue generated by the auto-subscription scheme, Pearse, Liu, and other co-conspirators took steps to conceal the scheme from the mobile carriers and mobile industry compliance groups. For example, another co-defendant (and cooperating witness) Machael Pacjkowski helped Miao, Pearse, and Liu correct errors in the Auto-Subscription Platform that had raised red flags in the U.S Mobile Aggregator's short code monitoring system. (PSR ¶ 50). For example, as reflected in, among other things, emails from the Tatto Server, Pearse and Liu modified the Auto-Subscription Platform to randomize the timing of the text messages that it generated – which were supposed to appear as if they were generated by actual consumers opting-in to the Premium SMS service – in a way that made them appear human-driven, not computer-driven. The goal was to make the subscriptions appear natural in order to avoid short code audits entirely or to minimize their severity. (PSR ¶ 50).

In total, Miao received approximately $50 million in fraudulent proceeds from the scheme to auto-subscribe with Tatto. Miao, in turn, distributed over $10 million of those fraudulent proceeds to Pearse, in payment for Pearse's participation in the scheme. (PSR ¶ 56). Liu was paid a salary and bonuses for his employment at Bullroarer that totaled approximately $44,000 per year for the period in which he participated in the fraud scheme.

Liu was arrested in Australia pursuant to the Government's red notice on or about December 20, 2018, and extradition proceedings ensued. Liu contested extradition until at least May 2020 and was detained in Australia pending the conclusion of the extradition proceedings. The Australian government ultimately issued a surrender warrant for Liu, and he was extradited to the United States on January 25, 2021. The following day, on January 26, 2021, Liu was presented and arraigned before U.S. Magistrate Judge Debra Freeman, who ordered Liu detained following a bail hearing.

## 2. The Charges, the Plea Agreement, and the Guidelines Calculation

On or about March 16, 2021, the defendant pleaded guilty to Count One of the Superseding Indictment, S3 15 Cr 616 (AT), which charged him with participating in a conspiracy to commit wire fraud by auto-subscribing consumers. (PSR ¶¶ 1, 2). The defendant pleaded guilty, pursuant to a plea agreement. (PSR ¶ 14).

The plea agreement between the defendant and the Government set forth the calculation of the appropriate Guidelines Range under the United States Sentencing Guidelines. The parties agreed that the following enhancements and decreases are warranted:

(1) A base offense level of 7 pursuant to U.S.S.G. § 2B1.1(a)(1);

    (2) A 22-level increase, pursuant to U.S.S.G. § 2B1.1(b)(1)(L), because the loss amount was more than $25,000,000 but less than $65,000,000;

    (3) A two-level increase, pursuant to U.S.S.G. § 2B1.1(b)(2)(A), because the offense involved 10 or more victims;

    (4) A two-level increase, pursuant to U.S.S.G. § 2B1.1(b)(10), because the offense involved sophisticated means and the defendant intentionally engaged in or caused the conduct constituting sophisticated means, and/or a substantial amount of the fraudulent scheme was committed from outside the United States;

    (5) A three-level decrease, pursuant to U.S.S.G. § 3E1.1(a) and (b), for acceptance of responsibility.

In accordance with the foregoing, the applicable Guidelines offense level is 30. The parties agreed that Liu has no prior convictions and, therefore, his Criminal History Category is I, yielding a Guidelines Range of 97-121 months (the "Stipulated Guidelines Range"). The Probation Office calculated the same offense level, Criminal History Category, and Guidelines Range as that contained in the plea agreement. (PSR ¶¶ 94-111; PSR at 29).

The Probation Office recommends a below-Guidelines sentence of 48 months' imprisonment. (PSR at 29, 31). The defendant requests a below-Guidelines sentence of 31 months' imprisonment, effectively time served when Liu's time in custody (in Australia) litigating extradition and awaiting sentencing are taken into account. (Def. Sub. at 2). In the Government's view, a sentence below the Guidelines range sentence of 97-121 months' imprisonment would be reasonable and appropriate in this case.

**B.**    **Discussion**

    **1.**    **Applicable Law**

The Guidelines are no longer mandatory, but they still provide important guidance to the Court following *United States* v. *Booker*, 543 U.S. 220 (2005), and *United States* v. *Crosby*, 397 F.3d 103 (2d Cir. 2005). "[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range," which "should be the starting point and the initial benchmark." *Gall* v. *United States*, 552 U.S. 38, 49 (2007). The Guidelines range is thus "the lodestar" that "'anchor[s]'" the district court's discretion. *Molina-Martinez* v. *United States*, 136 S. Ct. 1338, 1345-46 (2016) (quoting *Peugh* v. *United States*, 133 S. Ct. 2072, 2087 (2013)).

After making the initial Guidelines calculation, a sentencing judge must consider the factors outlined in Title 18, United States Code, Section 3553(a), and "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing outlined in 18 U.S.C. § 3553(a)(2). To the extent a district court imposes a sentence outside the range recommended by the Guidelines, it must "'consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance.'" *United States* v. *Cavera*, 550 F.3d 180, 189 (2d Cir. 2008) (en banc) (quoting *Gall*, 552 U.S. at 50).

2.  **A Sentence Below the Guidelines Range of 97 to 121 Months' Imprisonment Would Be Just and Appropriate**

The Government submits that a sentence below the Guidelines range of 97 to 121 months' imprisonment would be a fair and appropriate sentence. On the one hand, the nature and circumstances of the offense and the need for specific and general deterrence weigh in favor of a substantial sentence, especially given that the defendant's expertise was crucial to the success of the scheme. On the other hand, the defendant was among the lower tier of participants, exercised no authority over the scheme, and received almost no personal gain for his role in an otherwise massive consumer fraud. Based on this unique set of circumstances, the Government submits that a sentence below the Guidelines range of 97-121 months' imprisonment would be sufficient, but not greater than necessary, to serve the proper aims of sentencing.

The nature and circumstances of the offense are unquestionably serious. The defendant used his specialized skills to steal from hundreds of thousands of American consumers, ten dollars at a time. By building the Auto-Subscription Platform, Liu intentionally falsified the authorization of hundreds of thousands of U.S. consumers, knowing that they would be charged without their consent for services they did not want. The loss to consumers that resulted was tremendous, as reflected by the $50,000,000 in proceeds that was reaped by Lin Miao, which he then shared with co-conspirators. Liu's boss, Michael Pearse, personally pocketed at least $10 million dollars. The scale of this fraud was massive, and any sentence imposed must account for of the audacity of the offense.

Moreover, Liu knew that what Pearse asked him to do was doing was wrong and yet he did it anyway. (PSR ¶ 92). He even took steps to cover it up. At the direction of Pearse, Miao, and Pacjkowski, Liu modified the Auto-Subscription Platform so that it better mimicked the timing and rhythms of human authorizations and could thereby better evade detection by regulators. These facts make plain that Liu's actions were not a momentary lapse in judgment. Although Liu did not ask to join the scheme, he did not hesitate when directed to break the law and steal from hundreds of thousands of consumers and then to help cover it up. The sentence imposed must, therefore, specifically deter to Liu so that he is never again tempted to follow an employer's orders without regard to their unlawfulness.

Any sentence imposed must also provide adequate general deterrence to others similarly situated. Simply put, without Liu's technical skills, this scheme would not have been possible. Internet-based consumer frauds are extremely difficult to detect, and even more difficult to deter, because it has become so easy for those with Liu's expertise and training to exploit U.S. consumers from behind a computer screen thousands of miles away. It is, therefore, extremely important that the sentence imposed provide adequate general deterrence so that others with Liu's skills are not tempted to use their expertise to victimize others.

Notwithstanding the seriousness of the offense, and the need for specific and general deterrence, Liu was ultimately a lower-level participant in the scheme. This is reflected by the fact that Liu received virtually no personal benefit from his participation in the scheme other than his modest salary of approximately $44,000, which reflected both his legitimate work at Bullroarer *and* his work on the Auto-Subscription Platform. Liu was not a leader or an architect of the scheme, even though the scheme would not have been possible without his programming skills.

Moreover, Liu has already served approximately 31 months in custody (the vast majority of it in Australia) since his arrest in December 2018. This already places him near the middle range of the defendants who have been sentenced. (PSR ¶¶ 16-20). Darcy Wedd, an undisputed leader of the scheme, was sentenced to 120 months' imprisonment after conviction by a jury. His lieutenant, Fraser Thompson, was also convicted by a jury and was sentenced to 60 months' imprisonment. Francis Assifuah, who participated in the scheme for less than one year, but opened his own digital content provider for the sole purpose of auto-subscribing, was sentenced to 36 months' imprisonment. Notwithstanding the importance of Liu's programming skills to the success of the scheme, these defendants are more culpable than Liu and personally benefitted more from the scheme that Liu. It is these factors that lead the Government to recommend a sentence below the Guidelines range.

**C.   Conclusion**

For the reasons set forth above, a sentence below the Guidelines range of 97-121 months' imprisonment would be sufficient but not greater than necessary to satisfy the goals of sentencing.

Respectfully submitted,

AUDREY STRAUSS
United States Attorney

By: _____
Jilan J. Kamal
Olga V. Zverovich
Assistant United States Attorneys
(212) 637-2192

cc:   Anthony Cecutti, Esq.